## LAVER *v.* DENNETT & Another.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF CALIFORNIA.

Argued October 9th, 1883.—Decided October 29th, 1883.

*Assignment—License—Mistake—Patent.*

After many conversations, and after a draft agreement had been made, A, in 1870, in writing, granted to B a license to make, use, and sell, and vend to others to sell, an invention in defined districts. In 1873 B discovered that the agreement gave him no exclusive rights, which it was the purpose of both parties to have done. He notified A, and A at once offered to grant such right for the original consideration. In November, 1873, B refused to accept a new agreement, and took steps to terminate the existing one. A thereupon sued B for royalties claimed to be earned under it. B filed a bill in equity, claiming that there was a mistake in the agreement, and praying to have it cancelled and A restrained from prosecuting an action under it: *Held,* That there was no mistake between the parties as to the agreement made; that the minds of the parties met, and an agreement was made, although the legal effect of it was different from what was intended; that A was not in default; and there was no ground for the relief prayed for.

Suit in equity to have an agreement respecting the transfer of an interest under a patent set aside and cancelled, as made under a mistake, and all suits at law thereon stayed and enjoined. The facts are stated in the opinion of the court.

*Mr. John F. Storft* for the appellant.

1. The contract failed to express the intent of the parties.

Where a mistake occurs as to the subject matter of the contract, there is no assent, and of course no contract. 1 Story on Contracts, sec. 538; 2 Chitty on Contracts (Am. ed.), 1089–90. Where there is a mutual mistake as to a fact forming the basis

of a contract, the contract will be void, although no fraud be practised. 1 Story on Contracts, sec. 539, and cases cited; 1 Parsons on Contracts, *p. 475. The mistake here is one of fact rather than of law. 1 Story Eq. Juri., secs. 152, 153, 164 f. Where the instrument, through the fault of the scrivener or otherwise, fails to state the full terms of the agreement or understanding of the parties, the mistake is one of fact, which equity will relieve against. *Hunt* v. *Rousmanier*, 1 Peters, 1, 12; *Hartford* v. *Salisbury Ore Co.*, 41 Conn. 113, 133; *Briosa* v. *Pacific M. Ins. Co.*, 4 Daly, 246; 1 Adams Equity (Am. notes), p. 169. In this case the fault of the scrivener must be imputed to the appellees who employed him. But were the mistake one of law, equity would afford relief. *Hunt* v. *Rousmannier*, 8 Wheat. at p. 211; *Wheeler* v. *Smith*, 9 How. 55, 81; *Whelen's Appeal*, 70 Penn. St. 410; *Hearst* v. *Pryol*, 44 Cal. 230, 235; 1 Story Eq. Juri., secs. 119 *et seq.*, 130, 134, 138. We find no case which we think precisely in point, and are unwilling, where the *effect* of the instrument is acknowledged to have been entirely misunderstood by both parties, to say that a court of equity is incapable of affording relief. Ch. J. Marshall in *Hunt* v. *Rousmanier*, 8 Wheat. at p. 216.

*Mr. R. E. Houghton* for the appellees.

Mr. Justice MATTHEWS delivered the opinion of the court.

This appeal is from a decree dismissing the complainant's bill, and the record discloses the following as the facts material to the determination of the controversy.

The appellees, in 1870, being British subjects, were owners of letters patent of the United States, bearing date January 4th, 1870, granted to one Dennett, for the term of seventeen years from August 13th, 1863, for an improvement in the construction of concrete arches for building. On November 2d, 1870, they entered into a written contract with the appellant, an architect, then residing in Albany, N. Y., but at the time of filing this bill a citizen of California. By this contract the appellees granted to the appellant, his executors, administrators, and assigns, during the residue of the unexpired term of the letters

patent, "full and free liberty, license, and authority to make, use, and sell, or vend to others to be sold, the said invention within the divisions of the United States, as thereinafter specified, or one or more of them, in the manner and according to the provisions and agreements thereinafter contained and upon the payment of the sums of money as therein provided, and not otherwise." For the puposes of the license the territory of the United States was *divided* into four *districts*, named A, B, C, and D respectively, and a royalty of ten shillings sterling per square of one hundred square feet was to be paid for all work actually done under the patent, and which, from certain specified dates, it was agreed should amount to an annual minimum sum of £500, and not to be payable in excess of an annual maximum sum of £1,000 in each of such divisions.

It was also stipulated that the appellant might surrender the license at any time upon giving six months' notice, and that the appellees might revoke it upon any default of the appellant after thirty days' notice.

It appears that this contract was entered into after many conversation between the parties, and after a draft agreement had been prepared and submitted to the appellant for examination. Upon his suggestion it was amended and finally executed.

Various unsuccessful efforts appear to have been made by the appellant while at Albany, and after his removal to San Francisco, and also by one Fuller, who acted as his agent at Albany, to introduce the patent; and some correspondence took place between the parties in regard to its progress and prospects.

This correspondence, as well as the negotiations which led to the execution of the contract, was conducted on the part of the appellees by Frederick Ingle; and it was to him that the following letter was addressed by the appellant:

"SAN FRANCISCO, 26*th April*, 1873.

"FREDERICK INGLE, Esq.,

  "5 *Whitehall, London, England.*

"DEAR SIR: It now turns out, just as Mr. Fuller and myself

are about to close negotiations for the sale of your patent right, that I have no power to sell. Will you, therefore, send me the proper papers from your firm, stating that you will not grant licenses to any one else in the United States? I enclose you an eminent legal opinion thereon. Mr. Fuller had arranged for the sale of Massachusetts, which includes Boston; but we wait for your proper authority, which must be exclusive, or no value can be attached to the license I hold. Of course I am aware of the understanding which I have stated your firm would not go back on, but then the parties purchasing hold that it is not exclusive. In like manner I am unable to close with parties here for section D. I have had so much trouble with this matter, and now that it appeared to be in a good way to be productive of profit this annoyance arose. You can, however, remedy it in the way prescribed. Yours very truly,

"Augustus Laver."

"P. S.—Send the papers to Mr. Fuller, at Albany, and then he will send me duplicates. "A. L."

This letter seems to have been received by Ingle, and in reply he sent by cable the following:

"*May* 6, 1873.

"Fuller, *Architect, Albany, New York:*

"Dennett will alter agreement, giving Laver exclusive right.
"Robert Dennett & Co."

Fuller had evidently written a letter to Ingle, to the same effect, about the same time, for, although it is not contained in the record, Ingle's reply to it, written the day he sent the cable message, was produced and read in evidence. In this letter, dated May 5th, 1873, he says, referring to the objection to the terms of the license, "there is no objection on our part to alter it in any way to suit the requirements of the case." He adds:

"You will bear in mind that this lease was granted to Mr. Laver to pay as an annual royalty. If it had been proposed then to purchase out and out, I dare say the terms to the exclusive right would have been more precise; at any rate, our intention was for Mr. Laver to have the exclusive right (in all our negotia-

tions), and when the document was signed we looked upon it as so settled, unless he elected to throw it up before certain dates for the respective sections as specified in the agreement. He had the document to examine before signing it, and could have made the objection then. At any rate you will, I think, give us credit for having faithfully carried out both the letter and spirit of the agreement. We have had many applications from parties for permission to work the patent in the United States since October, 1870, the date of our agreement, but have had to reply in each case that our arrangements as to licensing were made. . . . .

"I shall write to our solicitor, Mr. Van Santvoord & Hauff, of Times Building, Park Row, New York, and instruct him to get whatever you require with regard to the specification. I don't know in what respect it is incomplete. The agreement can be altered to give any parties who propose to purchase the most absolute rights, on payment of the purchase money of section B."

He then proceeds, in answer he says to a request to that effect, to give the prices for each division, upon an out and out purchase of a gross sum; and referring to Laver's statement, that Fuller was on the point of completing the negotiations for division B, he says:

"To facilitate completion of the matter, had you not better write to or see Mr. Van Santvoord, whom we will instruct to give you as much assistance as he can. We could not, of course, undertake any litigation in respect of infringements, after we had disposed of our rights for a fixed sum."

He says, further:

"Our wishes have always been to give him exclusive rights, and I thought that the agreement expressed as much before you raised the question. At any rate we are willing to alter it to facilitate your negotiations. The question is, how is it to be done?

"One plan is for us to send power of attorney out to Mr. Van Santvoord, and tell him to alter the agreement and sign for us. Another, and I think a preferable plan, is to write to him to prepare two fresh copies of agreement, distinctly giving Laver exclusive rights, and referring to the old agreement, which will be thereby cancelled. He will then let you see the alterations. One

copy must be sent to Laver for signature, and another to us, and on the return you and Van Santvoord can exchange them. You must clearly understand, however, that we shall not consent to any other alterations, or to introduce any fresh clauses."

On May 9th, 1873, Ingle wrote to the appellant as follows :

"DEAR SIR: Yours of 29th March came duly to hand, with enclosures, and I delayed answering it for a week or two, as I was expecting to hear from Mr. Fuller. I have now heard from him, and you no doubt know to what effect.

"He complains of the agreement not giving you exclusive rights. I think it expressed enough for the purpose contemplated at the time, and you were satisfied with it. At any rate, we intended to give you exclusive rights, and have in all good faith acted up to that intention, inasmuch as we have refused many offers of agency since October, 1870, the date of our agreement with you. I suppose Mr. Fuller will send you the letter I wrote him in reply ; at any rate, I will write him by this post a line requesting him to do so ; then you will see exactly what I propose to do. I may say that I have also by this post instructed Mr. Van Santvoord, our solicitor in New York, to prepare full agreements, giving you exclusive rights, and send them to each of us to be re-signed and exchanged ; when this is done they will supersede the others, and I hope will be sufficient for Mr. Fuller's purpose.

"Speaking generally, our view with regard to this matter is this (I mean Dennett's and my own), that we gave a liberal margin of time to make preliminary arrangements, and asked for only a moderate royalty on each section. You had the option of holding or abandoning up to certain dates. If you had decided to surrender, we should have been losers of two years of valuable time, and should have had all our work to begin over again. As you elected to keep the patent right, you could hardly expect us to forego the just claims for which we stipulated, after such very liberal reservations in your favor. We do not suppose for a moment that you expect this. We do not wish to press you hardly in the matter, but it is really time now that some tangible return was made to us ; of course if the section B is sold at once, and the money paid over, as we hope it will be, we forego any claim for royalties already due on that section."

It is also shown that the appellees, on May 10th, 1873, wrote to their solicitors in New York, giving instructions in reference to drawing up a fresh agreement, giving the appellant the exclusive rights which he required; but that neither the appellant nor Fuller, his agent, communicated with the solicitors on the subject. It was not until November 3d, 1873, that appellant wrote to Ingle refusing to sign any new agreement, and claiming that the defect in the original agreement had resulted in the loss of the sale of the patent for Massachusetts for the price of $30,000, and intimating that in consequence thereof, the appellant was entitled to treat the whole matter as at an end. On October 12th, 1874, the appellees, having in the meantime, by further correspondence, insisted upon their rights under the contract, and demanded payment of the royalties which had accrued, brought an action in the Circuit Court of the United States for the District of California against the appellant to recover the amount due on account thereof. And on September 3d, 1875, the appellant filed this bill in equity in the same court, in which it was claimed that by reason of the mistake in omitting from the contract a grant of the exclusive right to the appellant to use and sell the said invention under the said patent, the said indenture was not the agreement of the appellant, and that in November, 1873, because of said defect, he had surrendered said invention and indenture, and all his rights thereto and thereunder, to the appellees. The bill prayed that the indenture be ordered to be cancelled, as executed by mistake, and that the appellees be perpetually restrained and enjoined from the prosecution of the action at law upon it.

The chief, if not the only instance, in which, it is alleged, the defect in the license actually operated to the injury of the appellant, is the loss of the sale of the patent for the New England States; and as to that, the proof wholly fails. The only witness examined on the subject is the appellant himself, who knew nothing of it, except as he learned it from Fuller, his agent; and his evidence, being hearsay, cannot be regarded. The parties with whom the negotiations took place, and who, it is said, refused to proceed after discovering the defect in the license, are not examined nor even named. Fuller, the agent

of the appellant, who personally conducted the negotiation, is not examined as a witness at all; and in his letter to Ingle of June 23d, 1873, gives an entirely different account of the reasons for the loss of the sale. He there says:

"*Your decision not to protect* the patent renders it valueless, even if it could not be infringed. *The duration of the patent is so short* no parties would dream of paying large sums for it. Acting as Mr. Laver's attorney, I did the best I could to dispose of it for New England States. *That is now abandoned unless the patent can be extended.*"

There is no proof of fraud or misrepresentation on the part of the appellees, and all charges to that effect in the bill, are substantially withdrawn by the appellant in his testimony.

It is claimed, however, on the part of the appellant, that he has a strict right in equity to the relief prayed for in his bill, on the ground that no contract was ever in fact entered into, the minds of the parties never having met upon the same terms.

But there is no foundation for such a contention. The minds of the parties did meet. There was in fact an actual agreement, the terms of which were perfectly well understood by both parties. They acted upon that understanding from the time the instrument was executed; and when the appellant first discovered that it did not have the legal effect intended, and gave notice to the appellees accordingly, there was no controversy between them on the subject. The common intention was at once admitted, and the necessary correction promptly offered. There was, no doubt, a mistake, but it was in the instrument which undertook to express the agreement, and not in the agreement itself. It did not relate to any matter of fact which was the basis of the contract, an error in regard to which would be fundamental, and therefore fatal, but affected only the document which professed to express, but did so incorrectly, the actual intention of both parties.

It is equally wide of the mark to say, as it was argued, that the contract has failed by reason of the failure of the consideration. The appellant cannot say that he did not acquire something by reason of the license, although his right was not, as

it was intended to be, exclusive. But so far as appears in the case, he had the same benefits and advantages he would have enjoyed if the instrument had contained the exclusive grant it was supposed to secure. For the parties on both sides acted upon that construction, and, as we have already shown, no actual loss is proven to have arisen to the appellant by virtue of the defective assurance.

That the instrument imperfectly expressed the agreement of the parties was not the exclusive fault of the appellees. It was the duty of the appellant to have discovered the error before executing the contract. He did not, in fact, find it out until after two years from its date; and then, applying for its correction, failed to avail himself of the offer of the appellees, promptly made, in response to his demand to execute a corrected agreement.

The only equity which the appellant could claim was to have the mutual mistake in the language of the instrument corrected, until some default had occurred on the part of the appellees. But they were in no default. They offered to make the correction as soon as they had notice of the mistake; but the appellant declined to accept it. After the further lapse of more than six months, he insisted on his right to put an end to the agreement itself. This he was in no position to do. His delay to assert such a claim, if his right had been otherwise better founded, constituted such laches as would, at least, greatly weaken his title to relief, if it did not amount to a bar; and coupled with the loss to the appellees of the value of their own rights under the patent, which cannot be restored, would make it inequitable, as against them, to absolve the appellant from the legal obligation of his contract.

We see no ground in the facts of the case for the application of the principles and authorities invoked by the appellant as a warrant to grant him the relief for which his bill prays.

*The decree is accordingly affirmed.*